[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
The matter before the Court is a petition for the assessment of damages arising out of the taking by condemnation of a portion of the land of Petitioners Todesca/Forte Brothers, Inc. and James A. Forte and Joseph Forte.
The property is located partially in the Town of Cumberland and described in the Cumberland Land Evidence Records as portions of Plat No. 53, Lot Nos. 1683, 1650 and 1676 referred to by the Acquiring Authority at Plat No. 2087, Parcel Nos. 27A, 28A and 30A and partially in the City of Woonsocket as described in the City of Woonsocket Land Evidence Records as portions of Plat No. 45, Lots No. 1 and 9 referred to by the Acquiring Authority as Plat No. 2087, Parcel Nos. 29A and 47A.
On December 30, 1990, the State of Rhode Island took title to the condemned parcel which the parties agree consists of 15.153 acres of land. That portion of the parcel located in Cumberland was owned by Petitioner Forte Brothers, Inc. (Forte Brothers) and is known as the Manville Quarry, an existing quarry operation. The relatively small portion which was located in the City of Woonsocket was owned by Petitioner C M Realty. This land was not used or zoned for quarrying operations.
The evidence adduced at trial was that as early as 1985 the Rhode Island Department of Transportation informed Forte Brothers, Inc. it intended to acquire the property through eminent domain for the construction of that portion of Route 99 which crosses the Blackstone River.[1]
Accordingly, Forte Brothers and the Rhode Island Department of Transportation entered into an agreement in the fall of 1985 whereby Forte Brothers agreed not to excavate the materials contained in the parcel below elevation 151 feet. Forte complied with this agreement but continued operations on the remainder of the quarry.
It is undisputed that the condemned parcel contains stone and gravel reserves which make the parcel uniquely valuable.
Petitioner presented O. Donald Hermes, an expert in geology and petrography. Dr. Hermes testified there are four rock types found in the Manville Quarry, igneous, metasedimentary, quartzite and schist, and these rocks exhibit characteristics of hardness, tenacity and interconnection due to the presence of a contact zone in the area.
Mr. Thomas Gammino testified that he is a vice president for operations and engineering at Tilcon Gammino, Inc., a major road building concern in Rhode Island. Mr. Gammino stated there are only three major producers of crushed stone products in Rhode Island which are capable of producing material suitable for use in state road building projects because they meet RIDOT specifications. It is undisputed that these three producers are J.H. Lynch Sons, Tilcon Gammino and Forte Brothers. These three companies are also in the road building business and compete with each other for RIDOT projects, each utilizing its own product. According to Mr. Gammino, 80% of the crushed stone produced by Tilcon Gammino is utilized by it in these road building projects. He indicated that in 1990 the market for crushed stone was very good and Tilcon Gammino sold whatever it was able to produce.
The amount and quality of suitable recoverable materials at the quarry had a direct correlation to the market value of the parcel and was hotly contested by the parties.
The Petitioners presented the testimony of A. Russell Webster, Jr., an expert in the field of mining engineering and a professional land surveyor. Mr. Webster was retained as a consultant engineer at the Manville Quarry from 1983 to 1990.
In 1990 Mr. Webster was directed to determine the amount of suitable rock that could be recovered before the taking by RIDOT. Mr. Webster testified he prepared a mining plan in which he delineated the areas where rock could be recovered and then designed a recovery plan in light of existing perimeter boundaries, wetland buffers and other restrictions. Mr. Webster calculated the amount of suitable recoverable rock above elevation 120' Mean Sea Level; (M.S.L.). He defined suitable recoverable rock as rock which meets the standards set forth by RIDOT and the Massachusetts Department of Public Works (Mass. D.P.W.) for road and highway construction.
According to Mr. Webster, the total amount of suitable recoverable rock prior to the taking was 6,423,000 tons. The estimated loss as measured from the surface to elevation 120' M.S.L. is 1,188,150 tons. The total suitable recoverable rock measured from 120' M.S.L. to 80' M.S.L. is 2,221,360 tons. Mr. Webster estimates the total loss of suitable recoverable rock due to the taking to be 3,409,510 tons. He estimated the remaining rock reserves after the taking to be 3,013,500 tons. Thus, according to Mr. Webster, a minimum of 51% of the suitable recoverable rock of the entire quarry was lost due to the taking. This loss reduced the expected life of the quarry, based upon actual production figures from 1990 and assuming a production increase of 5% per year, from 13.7 years to 7.5 years.
Respondents strongly disputed these figures, particularly the annual 5% production increase projected by the Petitioner. According to Mr. Webster, a 5% increase is quite normal and is typical in the industry. Further, Mr. Frank Aceto, a vice president for sales and materials at Forte Brothers, testified he supervised the daily operation of the Manville Quarry during 1989 and 1990 including its quality and quantity of production. Mr. Aceto agreed with the projected 5% increase in production. He based this testimony on an increase in demand due to existing construction schedules, Forte's share of the market for competitively bid road projects and the dwindling reserves at one of the remaining quarries in Rhode Island.
In addition to the suitable recoverable rock, the condemned parcel also contained significant quantities of marketable sand and gravel, bank gravel, quarry washings and random fill. The parties have agreed that 86,185 cubic yards of sand and gravel and 66,000 cubic yards of other material were lost due to the taking. This material also met RIDOT specifications for construction and had a market value for use in the construction industry. According to Aceto, sand and gravel sold for $5.75 per cubic yard and the other material ranged from $3.00 to $10.50 per cubic yard.
Aceto testified at length regarding the costs associated with the production of one ton of crushed stone product. In calculating these costs he considered the normal costs of maintenance, subcontractors and blasting but did not include general and administrative expenses. Respondent vigorously argued these costs should also be included in calculating the cost to produce a ton of stone. Aceto concluded that in 1990 it cost Forte Brothers $6.12 to produce a ton of stone.
Aceto then calculated the average selling price for a ton of stone. This average price calculation was necessary because 60% of the stone was "sold" in intercompany transfers and 40% was sold to third parties at a higher price. The average selling price was $7.30 per ton. When the actual cost of $6.12 is subtracted from the average selling price, $1.18 is the average selling price net of cost for a ton of stone at the Manville Quarry. Petitioners also maintain this $1.18 figure represents the net value of a ton of rock.
Thomas Russo, one of the purchasers of Forte Brothers, Inc., testified that he has extensive experience in buying and operating quarries. He testified he has no financial interest in the outcome of this litigation. Mr. Russo considered the value of a ton of rock in place in early 1991 to be $2.00 per ton. In his opinion the value of the Manville Quarry after the condemnation was $5,000,000.00.
Petitioners are not seeking compensation for the net value of the stone as a separate item of damage. Bruce v. State of RhodeIsland. Department of Public Works, 93 R.I. 466 (1962). They maintain, however, and the Court agrees that the value of the mineral resources is a relevant factor in the market value of the land as adapted as a stone quarry.
William E. Coyle, an experienced real estate appraiser, testified at length regarding his background as a former owner of a gravel bank and extensive experience in appraising gravel banks and quarries in Rhode Island and Massachusetts. According to Coyle the highest and best use of the property is its existing use as a quarry with some residual value following the depletion of the reserves.
Coyle testified the best method for valuation of the property is the market data or comparable sales approach, the preferred method in condemnation cases. Warwick Musical Theatre, Inc. v.State of Rhode Island, 525 A.2d 905 (R.I. 1987) where there are in fact such sales available for comparison. Factors which affect comparability include the location and character of the property, the proximity in time of the sale to the taking and the use to which the property is put. Warwick Musical Theatre, 525 A.2d at 910 citing Corrado v. Providence Redevelopment Agency,117 R.I. 647, 654, 370 A.2d 226, 230 (1977).
Coyle testified that where the land is adapted for a special purpose, Bruce v. State Department of Public Works; O'Donnellv. State, 117 R.I. 660 (1977), the density, volume, hardness and value of the rock are all related to the character of the property and are proper factors to determine not the value of the rock but the value of the land in the market in view of its adaptation for that and other uses. Green v. State Board ofPublic Roads, 50 R.I. 489 at 492.
Coyle performed a sales comparison analysis and utilized four sales of properties that were or at one time had been sand and gravel operations. The Respondent's real estate expert, Webster A. Collins, also performed a comparable sales analysis and utilized some of the same sales as Coyle and reached very different results. Thus, the Court finds it necessary to review each of these sales separately.
Because the highest and best use of the property was as a currently operating material source with mineral deposits and characteristics which contributed to the value of the whole parcel, Coyle based his opinion on a before and after valuation as of December 30, 1990. In each of his comparables Coyle factored into his opinion the quantity and quality of the gravel and rock in adjusting the subject site to the comparable sales. The degree of comparability between the comparables and the subject property is a question of fact for the trial justice.
Coyle's analysis resulted in significant adjustments in this area because Coyle found no sale which included significant reserves of stone and rock coupled with the ability to remove the rock free from zoning or other restrictions. Coyle found that the taking of the prime quarry area and its reserves with a loss of 51% of the suitable recoverable rock to dramatically reduce the life of the quarry and to affect the after value of the property.
Coyle further found that the condemnation resulted in the severing of the original parcel into two separate parcels divided by the freeway. Coyle found that access to the northerly section which partially lies in Woonsocket is through a right of way under Rt. 99 and results in a circuitous route to the parcel and adversely affects its future development.
Coyle testified he personally visited each site and investigated the nature and extent of the mineral resources at each location with Dr. Hermes, Petitioner's geological consultant. Coyle concluded that these locations did not contain similar material, particularly solid rock. He also concluded the sites could not be quarried to the same extent as the condemned parcel. Coyle made significant value adjustments to each comparable sale based upon the quantity and quality of the rock found in the Forte property.
Similarly, Coyle found that the taking adversely affected the remainder of the property. Among the factors Coyle considered was the fact that 51% of the rock reserves were concentrated in 10 of the 15 acres of the take. Coyle stated it is more difficult and expensive to quarry the remaining 49% of the reserves because these reserves are spread over the remaining 81 acres of the quarry.
The first sale Coyle utilized was a gravel bank on Victory Highway in North Smithfield. This parcel sold in June 1987 for $65,000.00 or $54,621.00 per acre. To this price Coyle added 5% per year for time for a total of 17.5%. He made a negative 40% adjustment for size based on the accepted principle that a smaller parcel will bring a larger price per square foot. He also made a 10% adjustment for location based upon his belief that the condemned parcel was more suitably located to the state's highway system and thus a more attractive location.
He made a 50% adjustment for both quality and quantity of materials in his analysis of value before the condemnation. He recognized these adjustments were significant but found them to be necessary based upon the quantity and quality of the materials on the condemned parcel. Coyle noted there were only three existing quarries in Rhode Island capable of producing stone products suitable for road building.
Coyle concluded with an adjusted sales price of $84,715.00 per acre for the 97 acres before the condemnation and an adjusted sales price of $76,242 per acre for the 81 acres existing after the taking.
The second sale Coyle utilized was a larger section of a parcel that at one time included sale number one. This parcel consisted of 16.20 acres and sold in December, 1987 for $400,000.00 or $64,516.00 per acre. Coyle made adjustments for time at the rate of 5% per year, a 30% negative adjustment for size, a 10% negative adjustment for location and a positive 40% adjustment for both quantity and quality of material before the condemnation but only a 20% adjustment for each of these factors after the taking.
Coyle's adjusted sales price was $97,117.00 per acre before the condemnation and $79,979.00 after the taking.
Coyle's third comparable was originally a bank gravel operation located in Burrillville, Rhode Island. Coyle testified this parcel was sold to Rosenfeld Concrete Corporation in order for the buyer to remove the remaining material and to build a concrete batching plant to produce concrete for the construction of the Ocean State Power Plant. Coyle concluded there were only minor minerals remaining on the site. This property sold for $54,000.00 per acre in November, 1987. Coyle's adjusted sales price for the 97 acres before the condemnation was $90,852.00 and included a 45% positive adjustment for both quantity and quality. Coyle's adjusted sales price for the 81 acres remaining after the taking was $71,725.00. The change in the adjusted sales price reflected the change in the adjustments Coyle made for both quantity and quality of only 25% after the condemnation.
The fourth comparable sale analyzed by Mr. Coyle was, in his opinion, closer in size and type of transaction to the subject parcel. This sale was also utilized by the Respondent's expert, Webster A. Collins. This site consists of 49 acres and was sold for $3,500,000.00 or $71,428.00 per acre in May, 1988. The parcel is located on New London Turnpike at the Coventry, West Greenwich and East Greenwich lines. This was a sale from L.L.B.C. Associates to Universal Truck and Equipment Leasing, Inc. Coyle found this site to be in a favorable location in close proximity to Interstate 95. The land consisted of a large on-going gravel and borrow operation but lacked any quantity of solid rock similar to the condemned parcel. Coyle made a 20% reduction for size but made no adjustment for location. He made a 25% adjustment for both quantity and quality of material and concluded with an adjusted sale price of $96,855.00 per acre based on the 97 acres before the condemnation. His adjusted sales price for the 81 acres remaining after the condemnation was $77,484.00 based on a 10% adjustment for quantity and quality.
Coyle testified he considered the adjusted sales price for each comparable but placed most reliance on sale number 4. His analysis resulted in an overall value of the Forte property before the condemnation of $95,000.00 per acre or $9,215,000.00. He concluded the parcel had an after value of $76,400.00 per acre or $6,188,400.00 for the remaining 81 acres. He concluded the total damage was $3,026,600.00 which he rounded to $3,000,000.00. Thus Coyle found the Manville Quarry to be worth significantly more in its original state then it was after the taking.
This is a classic example of a partial taking where the physical relationship between the property taken and the property that is left is so obvious that damages to the remaining tract must be considered. Orgel, Valuation Under Eminent Domain, § 47 (2nd ed. 1953). In cases where part of a tract is appropriated by the exercise of the power of eminent domain, the owner may recover damages to the value of the entire tract and is not limited to recovery of the value of only the part that is taken. 4A Nichols, The Law of Eminent Domain, § 14.01 [2] at 14-33 (3rd ed. rev. 1985). In a partial-taking case the state must compensate a landowner not only for the value of the land taken but also for any damage to the remainder. Capital Properties,Inc. v. State of Rhode Island; Taber v. New York, Prov. andBoston Railroad Co., 28 R.I. 269, 67 A. 9 (1907). The measure of damages is the market value of the land taken at the time it was taken together with any special and peculiar damages which may result to the remaining land, less any special or peculiar benefits. Allaire v. City of Woonsocket, 25 R.I. 414, 416,56 A. 262, 262-63 (1903). The damages can be measured by the extent to which the fair market value of the remaining land has been depreciated as a result of the taking. Hetland v. Capaldi, 103 R.I 616, 616-17 (1968). Evidence must be presented which establishes the value of the land prior to its taking less its value after the taking. Id. at 617. This is also referred to as a "before and after" method of valuation and is particularly useful in cases where the land taken is part of a special use or special purpose property. Capital Properties, 636 A.2d 319 (R.I 1994); Warwick Musical Theatre, Inc., 525 A.2d at 910.
Authorities recognize two generally accepted methods of computation of damages in partial taking cases, one involves determining the market value of the parcel actually taken and then measuring the difference in value of the remainder before the taking and after the taking. The second and far simpler method places a value on the entire tract just prior to the taking and a value of the remaining parcel after the taking. The difference in these two values is the measure of damages in a true "before and after" rule and is preferred by most authorities. 7A Nichols, The Law of Eminent Domain, § 12.02[3] at 12-5-12-6 (3rd ed. Rev. 1985).
Coyle accurately performed a valuation based upon a before and after method of valuation. His after value reflected a diminution of the value of the entire tract on a per acre basis from $95,000 per acre to $76,400. per acre. This opinion reflected Coyle's belief that the remaining land was severely affected not simply by loss of acreage but by real consequential damages. Coyle placed the entire damages at $3,000,000.00, as measured by the diminution in value to the remaining tract and did not include a separate item for the value of the land actually taken, although arguably he could have done so. Hetlandv. Capaldi, 103 R.I. at 615.
The Respondent's expert, Collins, on the other hand, testified he performed a before and after analysis but concludes by placing the same per acre value before the taking as after the taking. Collins concluded that the value of the parcel before the taking was $50,000. per acre and the value after the taking was also $50,000. per acre. This is the same result as calculating a value for the entire tract and merely subtracting the value of the part taken on a per acre basis.
The Court accepts as accurate and reliable the before and after method of valuation based upon an analysis of comparable sales presented by Mr. Coyle.
Coyle also added a separate alternate approach which he testified he used for testing the comparable sales approach. Coyle calculated the discounted present worth of the material if sold over time and calculated the extent this material enhanced the value of the property. Coyle accepted Mr. Webster's net value of the material in place of $1.18 per ton and discounted these sales over the time it would taken to deplete the rock in the quarry for a value of the materials in place of $2,700,000.00 combined with his opinion that the severance damage to the remainder of the parcel was $300,090.00 for total damages of approximately $3,000,000.00.
Coyle testified that in his experience in the valuation of gravel banks and quarries, the normal value for bank material ranges from $1.00 to $1.50 per ton in place. Coyle felt the Respondent's estimate of $1.18 in place was reasonable and would be accepted as reliable in the market. Coyle estimated it would take from six to seven years to deplete the reserves based on Mr. Webster's report. He thereupon applied a 12% discount rate and concluded the value of the property taken based on the contribution of the rock and its quantity and quality to be $2,700,000.00. To this figure he added $325,000.00 based on damages due to the severance of the parcel by the highway. Thus under this separate alternate approach, Coyle's calculation of damages is $3,000,000.00 and includes the present worth of the 15 acres taken based on the contribution of the rock reserves and damage to the remainder. As noted this approach was introduced merely as a check on the market approach. While such analysis may be helpful in cases of condemnation of special use property, under Green, Bruce and O'Donnell, it ought not be relied upon where there exists a sufficient number of sales of comparable properties. Warwick Musical Theatre, Inc., andCapital Properties, Inc. v. State of Rhode Island.
Petitioner also presented the testimony of Mr. James Forte, the Chief Executive Officer of Forte Brothers, Inc. and one of the principal owners of the property at the time of the condemnation. Mr. Forte testified he purchased the land for the quarry around 1956, having learned about quarries from his father, a supervisor at T.J. Quinn Quarry for 25 years. He testified he began to develop the quarry by first clearing the trees, stripping and stockpiling the loam and subsoil and removing all gravel on top of the stone. It took ten years to develop a working face in the quarry.
He testified there was a good market for crushed stone products because there are only three producers in Rhode Island, Forte Brothers, J.H. Lynch and Tilcon Gammino. These producers are also road builders who utilize most of what they produce.
Forte testified that he was always in the market for another quarry and frequently looked at other properties. In examining other properties he would look first to the quantity and quality of the materials, access to the proposed location and zoning. Forte testified he has never found land suitable for use as a quarry.
The Respondent, Rhode Island Department of Transportation, disputed the opinion of value presented by the Petitioners and suggested the value of the condemned parcel as of the date of condemnation was $855,000.00 or about $50,000.00 per acre.
The Respondent presented the testimony of Mr. James Humphreville, a geologist who holds a Master of Science degree in geology with a concentration in economic and structural geology. Mr. Humphreville resides in Lancaster, Pennsylvania and is a consultant in economic geology, groundwater geology and engineering geology. This consultant work includes work for quarries which involves exploring overburden, drawing mine plans and evaluating reserves.
The bulk of Mr. Humphreville's consulting work has been performed in Maryland, Pennsylvania, New Jersey, West Virginia and Delaware. Mr. Humphreville has performed no other consulting work in Rhode Island nor is he a registered engineer.
Mr. Humphreville acknowledged that in evaluating stone deposits it is important to possess a working knowledge of the market in a given area as well as the extent of the competition. He also acknowledged that prior to August, 1990 he had never rendered an opinion of value to any quarry operation in Rhode Island and was not familiar with the market for crushed stone products in Rhode Island prior to December, 1990. Respondent objected to Mr. Humphreville's testimony for all of these reasons.
Mr. Humphreville calculated the amount of tonnage in the entire quarry and calculated the total tonnage to be 5,782,880 tons, a figure approximately 10% less than Mr. Webster's calculation. He then calculated the tonnage in the area of the take to be 2,897,973 tons, about 15% less than Mr. Webster's figure of 3,495,010 tons. He attributed the differences in tonnage to differences in the allocation of benches in the rock face. He also stated he thought Webster Associates included tonnages that were outside the proposed pit limits prior to the taking.
Mr. Humphreville then proceeded to place a value on the stone that he determined was lost as a result of the condemnation. He did this by calculating the number of years it would take to quarry the stone had the take not occurred to determine how many tons per year would be lost to the owner. He then assigned a value of $0.45 per ton and applied a discount figure to reach the value to present day value.
Humphreville testified this $0.45 per ton is a royalty figure he selected by examining data published by the U.S. Bureau of Mines. Simply put, the Bureau of Mines conducts a voluntary semi-annual survey of rock producers in each state. These producers are requested to report the total tons sold and the value of the rock sold. Mr. Humphreville examined this data for the years 1985, 1987 and 1989. The average price of stone for these years, according to Mr. Humphreville was $6.16 which he increased to $6.21 apparently as a concession to inflation.
He assigned a royalty value of 7% to this $6.21 figure based on his experience that 7% was a figure that would be accepted by owners. He then multiplied $6.21 by .007 and concluded the net worth of the stone was $0.45 per ton.
Mr. Humphreville's methods of calculation is totally devoid of any scientific or economic support. While the witness stated he based his opinion or facts or data customarily relied upon by mining experts, there is no foundation for this conclusion. The 7% royalty figure has not been shown to be an accepted industry standard or even a recognized valuation tool by anyone but this witness. It is apparent this figure was selected by Mr. Humphreville from his own experience and is not a fair measure of value in the industry or in this market area. Thus the testimony is inherently unreliable and must be rejected.
The other data upon which Humphreville's opinion is based is equally suspect. The date compiled by the U.S. Bureau of Mines in its annual Minerals Yearbook is less than scientific. No evidence was presented as to the origin or reliability of this data, how it was compiled or indeed what it includes. Humphreville himself performed the calculation by adding the total tonnage divided by the total revenue. This exercise is inherently unreliable and cannot support an opinion of the market value of rock in the State of Rhode Island on December 30, 1990.
Further, the witness initially selected a 17 year depletion period for the stone. His report and ultimately the report of Respondent's real estate expert reflected a 17 year period in calculating the number of tons lost per year as a result of taking. At trial the witness changed his opinion to 14 years for depletion of the rock having had the benefit of listening to Mr. Webster's testimony.
The Court rejects the testimony of Mr. Humphreville regarding the value of the stone deposits. This expert opinion testimony lacks a proper foundation and is simply not reliable in any respect.
Respondent presented the testimony of Webster A. Collins, an expert real estate appraiser. Mr. Collins prepared an appraisal of the property and concluded its value on the date of condemnation was approximately $50,000.00 per acre or $855,000.00 The testimony of Mr. Collins was subject to intense impeachment and is unreliable in several respects.
While Collins insisted that the date of valuation was December 31, 1992, the date of condemnation, both his written appraisal and an addendum both reflect an appraisal date of November 30, 1992, almost two years later. Mr. Collins testified this date was incorrect and reflected a mere clerical error. The Court conducted a protracted hearing on this issue as well as the question of the appropriateness of Mr. Collins testifying as an expert witness in this case.[2]
Mr. Collins testified that November 30, 1992 was the date the appraisal was concluded and not really the date of valuation. However, on May 7, 1993 in preparation for trial, Mr. Collins testified he discovered the clerical error and sent Respondent a letter purporting to clarify the matter. However, rather than clarifying the matter the letter further confuses the issue and compounds the problem. The May 7, 1993 letter from Collins to Respondent restates the same incorrect date of November 30, 1992 as the date of valuation. Collins insisted this was but asecond clerical error. Petitioners strongly contested this assertion and valiantly attempted to convince the Court to exclude this appraisal. The Court rules the errors affected the weight to be accorded the appraisal but not its admissibility.
On the issue of the appropriateness of Mr. Collins appearing at trial and rendering testimony adverse to Petitioner's interest, Petitioners established that Mr. Collins was retained by Fleet Bank to appraise Forte Brothers, Inc. with a view toward Fleet financing the sale of the corporate stock of Forte Brothers, Inc. to Todesca/Forte Brothers, Inc., a new corporation. Petitioners claimed that in performing this appraisal Collins was given access to confidential financial information of Forte Brothers, Inc. Petitioners further allege they are unfairly prejudiced in this proceeding by the testimony of Mr. Collins who appeared on behalf of the Respondent, RIDOT.
Mr. Collins insisted that in preparing his appraisal for the condemnation he did not refer to the Fleet appraisal (referred to as Whittier I) and did not access any confidential information whatsoever. The Court declined to preclude Mr. Collins from testifying but noted that two very different appraisals would affect the weight to be accorded Mr. Collins' testimony. These two appraisals which purport to reflect market conditions at the same time are so far apart as to almost contradict one another. Mr. Collins explains this radical disparity on the ground that Whittier I was the valuation of an ongoing business and Whittier II was an appraisal of land with rock below. This distinction belies the reasoning set forth in these appraisals.
In valuing the condemned property, Mr. Collins testified he employed both a market sales comparison approach and a modification of the income approach which he characterized as ground rent capitalization.
In utilizing the market data or comparable sales approach, Collins determined the before value of the 97 acre parcel to be $4,860,000.00 or $50,000.00 per acre. He also determined the after value to be $4,100,000.00 or $50,000.00 per acre. Thus the value of the condemned parcel was determined to be $760,000.00 to which he added severance damages of $95,000.00 for a total damage of $855,000.00.
Collins testified he utilized six comparable sales in his analysis, including several sales utilized by Mr. Coyle. The first sale Collins compared was the New London Turnpike location, a site heavily relied upon by Mr. Coyle. Collins found this site to be a prime alternative use development site for commercial development in 1988, and based his opinion on this factor and not the extent of the stone reserves. Collins applied a 6% per year adjustment for time for a total of 16%, a negative 15% adjustment for size on the ground this comparable is smaller than the subject, and a negative 20% adjustment for alternative uses because he felt this property was markedly superior to the Forte parcel in terms of alternate uses.
Collins stated he had difficulty obtaining information about the quality and quantity of the stone on the site so he made no adjustment and thus assumed the sites were equal. These adjustments resulted in an adjusted sales price of $53,800.00 an acre as compared to Mr. Coyle's analysis which reflected an adjusted sales price of $96,855.00 per acre. Thus the Court is faced with two widely divergent opinions of value from two real estate experts.
The second comparable sale utilized by Mr. Collins was also the third comparable sale used by Mr. Coyle. Mr. Collins testified he found this site, located on Victory Highway in Burrillville, Rhode Island to not be comparable because it was purchased to set up a concrete plant for Rosenfeld Concrete. He did not perform any analysis of this property.
The third sale Collins utilized is property located on North Granite Avenue in Westerly, Rhode Island. This land was sold in June of 1988 for $500,000.00 and consisted of 36.20 acres with a sales price of $13,812.00 per acre. Collins considered this a highly comparable sale because he felt the parcel was bought for stone banking, that is future access to stone. Collins testified the density of stone reserves was 313,000 tons per acre which he felt compared to 182,000 tons per acre on the subject parcel.
In comparing this sale to the subject property, Collins made several adjustments. He made a positive 10% adjustment due to the banking of the stone reserves. He considered this site more valuable in terms of size and made a 20% negative adjustment for size. He considered the Manville Quarry to be a superior location and made a 10% adjustment for location and a 10% positive adjustment for a superior alternate use. He also made a 10% positive adjustment for quantity. These adjustments netted out to be a 5% positive adjustment for a value of the subject property of $14,500.00 per acre for the land alone.
Collins also analyzed another property in Westerly located on Old Hopkinton Road and described as the Cherenzia Quarry. This was a stone and sand and gravel quarry which sold in August of 1989 for $475,000.00. It consisted of 1,202 acres. Collins analyzed this property and found it to be slightly inferior to the subject parcel and he assigned a 5% positive adjustment. He made a 9% positive adjustment for time and a 25% negative adjustment because this parcel was smaller than the subject parcel. According to Collins, the available stone on this parcel is 100,000 tons per acre compared to 182,000 tons per acre at the Manville Quarry. Collins made a 30% positive adjustment quantity. This analysis resulted in an adjusted price per acre of $34,205.00.
With regard to both Westerly sites, Collins considered the stone in each site to be suitable for road building projects and testified that it met RIDOT specifications. The Respondent, RIDOT itself, offered no testimony to support this conclusion. Forte Brothers recalled A. Russell Webster in rebuttal. Mr. Webster testified he is familiar with both sites in Westerly. According to Mr. Webster the sites were originally part of a single parcel. The rock was quarried for cut stone for construction purposes, not road building. Webster described it as a granite type rock. Prior to December 30, 1990 the witness had occasion to perform tests on this rock to see if it was suitable for producing aggregate to meet RIDOT specifications. Mr. Webster personally supervised these tests and in his opinion the rock did not meet all of RIDOT specifications although it met some of them.
Mr. Collins testified he considered another site utilized by Mr. Coyle, the gravel and sand operation located on Victory Highway in North Smithfield, Rhode Island. Mr. Collins found this sale to be intended for residential development. He concluded this site was not comparable and declined to analyze it.
Finally, Collins considered a site in Carver, Massachusetts, located approximately 20 miles from the Rhode Island border. This site is described as Nemasket Sand and Gravel and, according to Collins, this transaction "exactly parallels what happened when Forte acquired the property under analysis." The owners of the property entered into a lease agreement with Nemasket Sand and Gravel for Nemasket to remove the overburden and to pay a ground rent at various prices for the overburden, sand and gravel and stone. The land was then put under a purchase and sale agreement. While the buyer was seeking approvals for an alternate use, the property continued to be quarried. The owners were paid, as of 1990, $0.50 per ton for the stone.
The purchase price for the property was $4,250,000.00 or $27,597.00 per acre. Collins made several adjustments to this price. He made no adjustment for time because the sale had still not taken place. He made a 20% positive adjustment for size because this site was larger than the Forte parcel. He considered the locations to be equal but the Forte parcel to be superior in terms of quantity of stone and adjusted upward for 35% for the subject property based on quantity. He concluded with an adjusted price per acre of $40,016.00.
According to Collins, his analysis of comparable sales led him to conclude the value of the Forte Brothers parcel to be $50,000.00 per acre both before and after the condemnation. He concluded total damages were $760,000.00 for land value. To this figure Collins added severance damages of $95,000.00. Collins testified that 5% of the land was impacted by the severance, 3 acres in Cumberland and 34 acres in Woonsocket because the highway separated this parcel from the remainder of the quarry. Collins recognized the Woonsocket portion was not zoned to permit quarrying but he assumed that quarrying would one day be a permitted use. When that occurred it would be necessary to haul the stone an additional 500 feet around the highway to the crushers.
Collins concluded that the total compensation to be paid to the Petitioner is $855,000.00. The Court notes that this analysis fails to consider the fact that over half of the stone reserves were lost in the condemnation and merely reflects compensation for a loss of acreage at $50,000.00 per acre and does not recognize any diminution in the fair market value of the parcel after the condemnation.
Collins also performed an income approach to valuation of this parcel. He utilized a discounted cash flow analysis in which he considered a stream of income derived from the sale of the stone projected over time and discounted at a commercially acceptable discount rate. In his report Collins notes he relied significantly on a study proposed by Mr. James A. Humphreville, a consulting geologist retained by the Rhode Island Department of Transportation. This testimony was given after Mr. Humphreville's appearance at trial and thus Mr. Collins attempted to retreat from this position. He stated he did not totally rely upon Mr. Humphreville's report and suggested he also relied upon the royalty of $0.50 per ton of stone as reflected in the Nemasket Sand and Gravel purchase and sales agreement.
It is apparent to the Court that the flawed analysis of Mr. Humphreville significantly contributed to Mr. Collins' testimony regarding a value from a discounted cash flow or income approach.
Collins estimated the revenues from the Manville Quarry on net royalty income from reserves as if the rights to extract those reserves were paid to the owner by a third party based on quarry production rates. He estimated the stone reserves to be quarried at 157,547 tons per year on the Cumberland sites and 13,796 tons on the Woonsocket sites for a period of 17.5 years. He also included 16,000 cubic yards of other reserves to be extracted over 5 to 7 years. These are reserves on the condemned portions only and do not include reserves on the remaining acres. Collins assigned a figure of $0.45 per ton for stone and $0.20 per cubic yard for sand, etc. with a growth rate of 4% per year beginning in 1993 for the duration.
Collins determined the land to have a residual value of $30,000.00 per acre in Cumberland and $27,000.00 per acre in Woonsocket which would increase at 0% for 5 years and 3% per annum for the remainder of the holding period. Collins then applied a discount rate of 12% on the royalty revenue and 15% on the residual land value. This analysis resulted in an opinion of value utilizing the income approach of $769,680.00 or $50,339.00 per acre.
Clearly the validity of this analysis depends upon the reliability of the royalty rate of the stone and other materials; the reasonableness of the discount rates and the feasibility of a 17 year recovery period. Much of this analysis is grounded upon the testimony of Mr. James Humphreville which has been rejected as unreliable. Mr. Collins did attempt to distance himself from Mr. Humphreville's report at trial but this is a pitfall that is unavoidable. Mr. Collins' testimony regarding the value of the stone in place, resting in significant part upon the unreliable and unscientific testimony of Mr. Humphreville is also rejected.
This testimony of course relates to his income approach to valuation and not to his opinion based upon the market analysis or comparable sales approach.
It is undisputed by the parties that over half the stone reserves in the quarry were lost in the condemnation. The Petitioner's expert, Mr. Coyle, clearly recognized this loss and made proper adjustments in his analysis of the comparable sales. Mr. Collins acknowledged that it is proper to ascribe a higher value per acre to land which has a greater concentration of stone than to land with a lesser concentration of stone. Yet his testimony with regard to the comparable sales and his ultimate opinion on the fair market value of the subject parcel fails to do that.
For purposes of this proceeding the original quarry consisted of 97 acres of land. The condemned parcel totalled between 15.1 and 15.7 acres with 82 acres remaining. It is a currently operating stone quarry and its highest and best use is its present use. The factors considered by Collins in performing his analysis do not reflect the nature and extent of the reserves or the fact that over half the reserves were lost.
To be reliable, comparable sales must measure the prices paid at or about the time of the taking at voluntary sales in the open market for parcels substantially similar and comparable to that taken. Corrado v. Providence Redevelopment Agency,117 R.I. 647, 653, 370 A.2d 226, 230 (1977). Here the comparables advanced by Collins, except the Westerly sites, were all reported to have a highest and best use other than as a quarry or were properties whose residual value according to Collins exceeded the value as a quarry.
Collins recognized the Westerly comparables as having a highest and best use as quarry land but incorrectly concluded the material met RIDOT specifications. He further failed to make the proper adjustments for quality of the material. He further failed to recognize these sites were not within the product market of the Manville Quarry, were remote from Providence and simply did not contain similar materials.
The Nemasket Sand and Gravel sale located in Carver, Massachusetts was not a consummated sale but rather the subject of a purchase and sales agreement entered into in 1989. The principal use intended by the parties, once the minerals aredepleted, is a sewage treatment plant for which permits were being sought. While the permitting process was on-going, the mineral deposits are being removed at a royalty rate. There is no evidence as to the quantity and quality of these mineral deposits or any evidence the site included rock that was included in the royalty rate. Indeed, Respondent presented testimony that Nemasket produced no stone products and did not contain reserves which met RIDOT and Mass. DPW specifications.
Finally, Collins utilized the large sand and gravel operation located at the Coventry, West Greenwich line on New London Turnpike. This sale was also heavily relied upon by Coyle who found it to be the most comparable property he utilized. This property, which contained no stone deposits, sold for $71,428.00 per acre and was sold as a currently operating sand and gravel facility. Coyle made a positive adjustment toward the Forte property to $96,855.00 per acre recognizing the absence of stone reserves.
Collins ignored the question of stone reserves and made no adjustment for this factor. Instead Collins determined the real value in this property lies in its potential as an alternate use site because of its proximity to Route 95. He thereupon made a significant negative adjustment to the Forte parcel to $53,819.00 per acre. The Court rejects this analysis because it fails to recognize the important factor of the stone reserves on the condemned parcel and the damage to the remainder. Further, Collins declares the highest and best use for this site is its potential for development after the depletion of the mineral deposits.
Collins also prepared an earlier appraisal of the Manville Quarry in connection with the sale of Forte Brothers, Inc. to the Todesca-Forte Corporation. Mr. Collins and Whittier Partners were retained by Fleet Bank to prepare an appraisal report for all of Forte's properties, including the Manville Quarry. This report was dated February 25, 1991, and specifically excluded the condemned parcel which was taken on December 30, 1990, only eight weeks earlier.
Mr. Collins estimated the value of the Manville Quarry at $4,472,102.00. He described the property as a special purpose property which has an interim use that produces greater economic rewards than the current value of vacant land. Collins suggested that this interim use is not only its highest and best use but also a special purpose use which produces the greatest economic return. He described the site as a contributory profit center to the overall business operations which produces greater economic rewards than vacant land. He also found, during the same period as the condemnation that few land comparable have attributes similar to the special purpose nature of the subject and he rejected the comparable sales analysis. Further, he found that the market for vacant land in 1990 had declined dramatically and comparable land sales were dated and far less reliable as market value indicators. Instead he primarily relied upon the income approach in rendering his opinion in 1991.
Coincidentally, he made the same observations as Petitioners in their case in chief. He noted the trend toward increasing public works expenditures particularly in road building and infra-structure rejuvenation in Rhode Island. He emphasized Forte's solid share of this market including work projects that were pending and the number of bids for future projects. He relied upon the abundant natural resources at the site as well as its current zoning. Collins also considered the rasidual value of the land after the depletion of its natural resources to be a significant factor affecting its value.
This appraisal directly contradicts Collins' in-court testimony and the report he prepared for RIDOT. Collins' attempts to distinguish the two appraisals on the ground that the Fleet analysis was an appraisal of a business as opposed to the RIDOT appraisal where he was valuing raw quarry land. This is simply not the case.
The Court finds that the condemned parcel was not simply raw land with no income stream. It was the heart of an existing quarry operation with a life expectancy of 14 years. The surgery performed by the Respondent in order to construct Route 99 not only severed the parcel but resulted in the loss of half of its blood supply — the stone which sustained its life. The fact that Collins ignores this in his appraisal and his testimony in court leads the Court to accord little weight to his opinion.
Where private property is taken for public purposes, the owner whose land has been taken is entitled to just compensation. The measure of damages to be awarded in condemnation proceedings is fair market value of the property. Ocean Road Partners v.State, 612 A.2d 1107 (R.I. 1992) This value must relate to the most advantageous and valuable use for the property, referred to as its highest and best use. Id., Citing, Sweet v. Murphy,473 A.2d 758, 761 (R.I. 1984) It is the duty of the trial justice to determine the fair market value of the condemned property at the time of the condemnation when the property is put to its highest and best use.
The Supreme Court has addressed the question of compensation in condemnation cases where the land has been adapted for a special use. Green v. State Board of Public Roads, 50 R.I. 489
(1930); Bruce v. State of Rhode Island Department of PublicWorks, 93 R.I. 466 (1962) and O'Donnell v. State,117 R.I. 660, 370 A.2d 233 (1977). As noted, the Court's function is to determine the value of the land considering its adaptation as a gravel operation. Bruce supra at 473 citing Green,50 R.I. 489, 492.
Thus the Court may not calculate a value of the stone and overburden on a price per ton basis, nor can there be compensation for the intangibles of business including loss of good will or future profits, there is compensation for land which has a special function. "Thus, a gravel pit may, in fact, be a business, but the land is nonetheless assessed as property adapted for a special use." O'Donnell, 525 A.2d at 665. But in performing this function inquiry must be made into the extent of the natural resource or mineral deposit. In this case the quantity and quality of the stone is a proper element to consider in valuing the property because it is these very factors which affect its value. An understanding of the quantity and quality of the stone are factors which buyers and sellers must possess before they buy or sell gravel banks or stone quarries. Townsendv. Mid-America Pipeline Company, 168 N.W.2d 30 (Iowa 1969);State v. Mottman Mercantile Co., 51 Wn.2d 722, 321 P.2d 912
(1958); Dow v. State, 107 N.H. 512, 226 A.2d 92 (N.H. 1967).
In light of this and after a careful review of the entire record, the Court is convinced that Mr. Coyle's analysis of the subject parcel and his opinion as to its before and after value is correct. The Court concludes that Coyle conducted a proper market sales analysis and made adjustments to the subject parcel based on the quality of the stone, its quantity and concentration on the site. The Court notes that certain of Coyle's adjustments for quality and quantity of the reserves totalled 100% of the sale price. However, due to the special purpose nature of the subject parcel, these adjustments are necessary and reasonable. Further, Coyle presented an adequate foundation to support his opinion on the degree of comparability.
Coyle personally visited each site and walked those sites with Petitioner's geologist, Dr. O. Donald Hermes, who advised Coyle about the nature of the mineral deposits and compared those reserves to those found at the Manville Quarry. According to Coyle, the nature of the material and its volume and density are factors which greatly affect the value of quarry land and it is these factors which he relied upon in formulating his opinion. The Court agrees.
The Court further finds that no parcel utilized by either side rises to the level of quality of the Manville Quarry or contain rock deposits which meet or exceed RIDOT and Mass. DPW specifications. Respondent has failed to satisfy the Court that the Westerly sales included stone deposits of like or superior quality to the subject. The Court accepts as accurate Mr. Webster's testimony that these sites did not meet RIDOT specifications. Collins should therefore have made a higher positive adjustment in favor of the condemned parcel for each of these sites.
After careful consideration, the Court concludes that Mr. Collins' testimony is not reliable and inherently flawed. The Court does not accept his explanation about the valuation date of November 30, 1992 which he repeated in an addendum. One cannot read his enthusiastic statements about the market for stone products and the rosy outlook for road building in his Whittier I appraisal and escape the conclusion, his opinion in Whittier II, with his "newly discovered" comparable sales was made with the benefit of 1992 hindsight.
The Court finds that the sales Collins utilized were not true comparables because he found them to have more profitable uses other than a stone quarry. Those sites which were actually comparable in terms of use were not adequately adjusted to reflect the presence of stone on the subject parcel and the absence of stone on the comparable.
Coyle's analysis is reasonable, reflects a careful understanding of the Rhode Island market for such special use properties and is based upon the very factors which drive the market for quarries and gravel banks — the nature and extent of the reserves and relevant zoning restrictions.
In addition to those findings previously made, the Court makes the following findings of fact and conclusions of law:
 (1) On December 30, 1990 the State of Rhode Island acquired, by eminent domain, 15.153 acres of land located in Cumberland and Woonsocket Rhode Island. This property was located within a larger parcel of land known as the Manville Quarry.
 (2) On the condemnation date, the Manville Quarry was an existing and operating rock and gravel quarry owned by Forte Brothers, Inc.
 (3) Both the quarry and especially the condemned parcel located within the quarry contain gravel and rock deposits. The removal of rock and gravel deposits from that portion of the condemned parcel located in Cumberland was a permitted use pursuant to Cumberland's Zoning Ordinance.
 (4) Removal of rock and gravel was not a permitted use in that portion of the condemned parcel located in Woonsocket.
 (5) The original parcel, for purposes of this proceeding, totalled 97 acres. Approximately 82 acres of the quarry remained after the condemnation.
 (6) The condemnation severed the entire parcel into two sections with access to the Woonsocket section provided by a right-of-way under the state highway.
 (7) On December 30, 1990 there were only three major producers of crushed stone products in Rhode Island. These three producers were also in the business of road building and were able to use or sell all of the stone product that was produced.
 (8) The rock that was located in the condemned parcel met or exceeded RIDOT and Mass. DPW specifications for road construction.
 (9) The total amount of suitable recoverable rock in the entire quarry prior to the taking was 6,423,000 tons. The total loss of suitable recoverable rock due to the condemnation was 3,409,510 or 51% of the total amount of suitable recoverable rock.
 (10) The life of the Manville Quarry was reduced from 13.7 years to 7.5 years as a result of the taking.
 (11) The highest and best use of the Manville Quarry on the date of the condemnation was its existing use as a stone quarry and in the production of sand and gravel and aggregate materials.
 (12) The condemned parcel contained rock and gravel reserves which are unique characteristics which contribute substantially to its value. The property is therefore unique or special purpose.
 (13) The quality and quantity of the gravel or rock reserves on the condemned property are factors to be considered in determining the property's value.
 (14) The presence of the rock and the ability to remove the rock contributed to the value of the entire quarry and the loss of the condemned parcel adversely affected the value of the remaining land.
 (15) The preferred method of ascertaining the fair market value of the land in condemnation cases is the comparable sales method. The Court finds these are sufficient comparable sales available to perform this analysis to the exclusion of other methods of valuation.
 (16) The proper measure of damages in a partial taking case is the difference between the fair market value of the entire parcel before the condemnation and its fair market value after the taking.
 (17) Evidence of the value of a ton of rock net of cost, discounted over time, provides an estimate of the value of the materials in place and serves as a valuable check on the accuracy of the comparable sales method.
 (18) The Court accepts Coyle's testimony that most gravel bank owners place the value of materials in the ground at $1.00 to $1.50 per ton.
 (19) The Court accepts as reliable the testimony of Frank Aceto and Russell Webster that the value of the rock in the Manville Quarry is $1.18 net of cost.
 (20) The Court rejects the testimony of James Humphreville and Webster Collins as it relates to royalty rates and their estimate of value of the rock in place at the Manville Quarry.
 (21) Evidence of the value of the rock in place may not be considered as a separate item of damage. It is a relevant factor to consider in evaluating the value of the parcel but is not a necessary element where there are sufficient comparable sales available to properly perform the comparable sales method of valuation.
 (22) The Court accepts as reliable and accurate Coyle's expert opinion that in view of its adaptation for a specific and special purpose and its unique characteristics the damage to the entire parcel based upon a before and after approach as of December 30, 1990 was $3,000,000.00.
 (23) Coyle's alternate analysis, while unnecessary to a determination of damages, provides a valuable check on the market data or comparable sales method particularly in light of his before and after valuation.
 (24) The Court rejects as unreliable and inaccurate the discounted cash flow analysis presented by Respondent's expert witnesses, Collins and Humphreville. This evidence lacks an adequate foundation and has no industrial or engineering support. Further, it is based upon calculations and estimates from reports of the U.S. Bureau of Mines that are simply not reliable.
 (25) The Court rejects the opinion of value expressed by Respondent's expert witness, Mr. Collins. Collins purports to give a before and after opinion valuation of the entire parcel but his conclusions merely reflect a diminution in acreage and not a true reduction in fair market value.
 (26) The Court further rejects the comparable sales analysis presented by Collins. His adjustments were artificial and did not reflect the quantity and quality of rock reserves at the condemned parcel.
 (27) Collins' appraisal is further weakened by the disparity between the date of valuation and the date of condemnation. It is apparent that the appraiser considered data that became known subsequent to the date of condemnation and that fact is reflected in his first report that the effective date of the appraisal was November 30, 1992. Collins repeats this date in a later letter as well.
 (28) The Court rejects Whittier I as evidence of damages in this case because it specifically excludes the condemned parcel and fails to value the Manville Quarry on or before and after basis.
 (29) Whittier I does however more accurately reflect market conditions at the time of the condemnation and serves to further erode the reliability of Collins' testimony.
CONCLUSION
After a careful and conscientious review of the entire record and based upon the findings of fact and conclusions of law set out herein, the Court finds the Petitioner has met its burden of proof in establishing its entitlement to just compensation. The Court finds the extent of the damages occasioned by the exercise of eminent domain by the State of Rhode Island to be $3,000,000.00.
Counsel shall prepare a judgment consistent with this decision.
[1] As fate would have it, Forte Brothers, Inc. was the Contractor awarded the construction contract for Rt. 99 and built the bridge across land that at one time was its own quarry.
[2] The purchase of Petitioner's Corporation, Forte Brothers, Inc. by Todesca Corp. was apparently financed by Fleet Bank. Mr. Collins and his employer, Whittier Partners were retained by Fleet Bank to appraise Forte Brothers, Inc. for purposes of financing. Thus, Collins prepared an appraisal dated February 25, 1991, referred to by the Petitioners as Whittier I.